Filed 10/13/23  P. v. Hubbard CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAQUAN TYRESE HUBBARD,<br><br>    Defendant and Appellant. | B319272<br><br>(Los Angeles County<br>Super. Ct. No. TA153015) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hector E. Gutierrez, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Daquan T. Hubbard guilty of murder and found true a gang enhancement. At sentencing, the trial court struck the gang enhancement under Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which changed the law on gang enhancements and enacted Penal Code[1] section 1109 to require bifurcation at trial of gang enhancements. On appeal, Hubbard contends that his conviction must be reversed because admitting gang evidence rendered his trial fundamentally unfair under section 1109. He also contends that the trial court misunderstood the scope of its discretion when it sentenced him to a 25-years-to-life term under section 12022.53, subdivision (d). We reject both contentions and affirm the judgment.

## BACKGROUND

I.     The murder of Hugo Zuniga

At Hubbard's trial, the trial court admitted video footage depicting relevant events. The videos were from a law enforcement officer's dashcam and video surveillance from cameras near and at the Nickerson Gardens apartment complex.

Those videos showed that at about 7:07 p.m., on September 16, 2020, Hubbard was on Lou Dillon Avenue in Nickerson Gardens. An Infiniti and Honda were nearby. The Infiniti was registered to Francisco Gonzalez, Hubbard's friend and fellow gang member. Hubbard, wearing red shorts and a white shirt, got into the Honda's front passenger seat.[2] A second man, who

---

[1]     All further undesignated statutory references are to the Penal Code.
[2]     As we later discuss, Hubbard admitted at trial that he was in the Honda but denied he was the shooter.

has never been identified, wearing a yellow shirt got into the Honda's driver's seat.

Around this time, Deputy Sheriff Gustavo Castaneda was at 105th Street and Lou Dillon in Nickerson Gardens conducting surveillance for an unrelated matter. The deputy had started following a suspect in that unrelated matter when a Honda followed by an Infiniti pulled in front of him. The Infiniti in front of the deputy stopped, and the Honda in front of the Infiniti slowed. Video showed a gun with a silver slide being pointed from the Honda's front passenger seat at a man on the street, and a white or light-colored shirt can be seen on the front passenger side. Ten to 15 gunshots were fired from the Honda at the man on the street, Zuniga, who died, having been shot eight times. Zuniga was shot about 90 seconds after the Honda left Nickerson Gardens.

The deputy maneuvered around the Infiniti and followed the Honda to the area of 112th Street and Compton Street, near Nickerson Gardens, where the deputy lost sight of the Honda.

Minutes after the shooting, the Honda returned to Nickerson Gardens and parked in a lot on Parmalee Street, where Hubbard's friend Drecore Dodson lived. Hubbard, still wearing a white shirt and red shorts, got out of the Honda's front passenger seat and walked to Dodson's residence, appearing to hold his right hand close to his side. Hubbard soon exited Dodson's residence and returned to the Honda, but he was no longer holding his right hand close to his side. The Honda then drove to nearby Hooper Street, also in Nickerson Gardens. There, Hubbard and the driver searched the Honda's front passenger seat area. Holding a cellphone, Hubbard extended his right arm in a shooting motion and fell to the ground.

3

## II. Physical evidence

From the area where Zuniga was shot, law enforcement recovered 13 casings. From Dodson's Parmalee residence, they recovered a silver nine-millimeter semiautomatic gun inside a pot filled with uncooked beans. The casings were fired from the gun recovered from Dodson's residence. Dodson told a police officer during an interview that Hubbard called and asked Dodson to hold a gun for him. However, at trial, Dodson would not identify who gave him the gun, responding "No comment" when asked if the person who gave him the gun was in the courtroom.

Officers recovered red shorts, a gun, gun magazines, and ammunition from Hubbard's girlfriend's home. In an interview with detectives after his arrest, Hubbard said the red shorts were his.

Cell site analysis of phone records showed that Hubbard's cellphone was in the area of the crime scene and Nickerson Gardens when Zuniga was shot. Hubbard's and Dodson's cellphones were in contact during the events.

## III. Gang evidence

Officer John Byun testified as the People's gang expert. He described gang culture, saying that gangs thrive on respect and gain it by having a violent reputation. To earn respect and status, gang members "put[ ] in work," meaning commit crimes for the gang, and gang members commonly commit crimes together. Gang culture forbids snitching, giving information to law enforcement. Snitching can result in a beating or getting killed.

Fudge Town Mafia Crips originated in the mid-1970's as a dance crew called Foe Tha Money. Fudge Town Mafia's territory

4

extends from 103rd Street and Santa Ana Boulevard in the south, to Wilmington Avenue in the west, and Weigand Avenue to the east.  The gang has at least three sets:  105th, 107th, and T-Funk Ridaz.  It has about 100 members in the Watts area of Los Angeles, 15 of whom are active members.  Officer Byun identified places Fudge Town Mafia gang members hang out in public, drinking and double-parking their vehicles to intimidate the public.  And on October 7, their "hood day" (a sort of birthday for gangs), they hang out on 107th Street, drinking and taking over the streets.  Fudge Town Mafia has been involved in murders, shootings, burglaries, robberies, vehicle theft, carjackings, narcotics sales, and weapons possession.

The Bounty Hunter Bloods gang primarily claims Nickerson Gardens as its territory.  However, it and Fudge Town Mafia have common rivals:  Watts Varrio Grape Street and Grape Street Crips.  Although there was no evidence the victim Zuniga was a gang member, the area in which he was shot was in Watts Varrio Grape Street territory.

Fudge Town Mafia has a hand sign, which Officer Byun demonstrated for the jury.  The gang uses the color brown.

In Officer Byun's opinion, Gonzalez (to whom the Infiniti was registered), Dodson, and Hubbard were active Fudge Town Mafia gang members.  Dodson and Hubbard have admitted to another officer that they were members of Fudge Town Mafia.[3] Photographs were admitted, and in one, Dodson, Gonzalez, Hubbard, and a fourth man are throwing Fudge Town Mafia gang signs.  (Peo. Ex. 61.)  In another photograph, Gonzalez makes a "C" with his hand to indicate Crips; Dodson makes a

---

[3]     At trial, Dodson admitted that he was a Fudge Town Mafia gang member.

gang sign with his hand that means "Fuck Pedaroll Mafia" (a Grape Street Crips set and Fudge Town Mafia rival); and Hubbard holds a brown bandana and wears "Foe Tha Money" clothing brand. (Peo. Ex. 63.) Video clips of Hubbard using gang vernacular and referencing his gang were played for the jury. A video from Dodson's social media account shows a group of men that included Hubbard assaulting someone. Dodson's, Gonzalez's, and Hubbard's Instagram usernames—respectively, ten7boskie, forthemoney107, and lofas107st—refer to 107th Street. Text messages from Hubbard's cellphone were also introduced. In one text, Hubbard referred to himself as "Penny," his gang moniker, and another text said, " 'Oh, okay, okay, That's Maftia.' " As the gang expert explained, the "f" and the "t" refer to Fudge Town. Hubbard, as well as Dodson, have tattoos associated with Fudge Town Mafia, with Hubbard having "M" for Mafia on his shoulder and hand.

In January 2016, an officer saw Dodson, Hubbard, and Gonzalez smoking marijuana and drinking in the area of 110th Street and Lou Dillon. Later that year in December, another officer had contact with Hubbard, who was again with Gonzalez.

The People introduced evidence of two predicate crimes. First, Gonzalez was convicted in October 2018 of being a felon in possession of a gun. Second, Dodson was convicted of gun possession in this case.

Based on a hypothetical modeled on the facts of this case, Officer Byun opined that such a crime would be committed to benefit Fudge Town Mafia's criminal enterprise.

IV.    Hubbard's testimony

Hubbard testified in his defense. On the day Zuniga was killed, Hubbard was smoking marijuana and drinking. A friend

6

picked him up to get food. His friend, whose name Hubbard refused to give, drove; Hubbard sat in the front passenger seat; and a third man sat behind the driver. All that Hubbard knew about the man in the backseat was he sold drugs. A child's car seat was in the back passenger seat immediately behind Hubbard. They started driving and had turned onto 105th Street when the man in the backseat yelled, " 'Oh, that's dude right there,' " shoved Hubbard, and started shooting a gun through Hubbard's window. They drove away, and at Anzac Street, the shooter got out of the car, leaving the gun. Hubbard called Dodson and told him he was going to drop something off. They drove to Dodson's residence and gave him the gun. After, Hubbard and the driver searched the car for casings. When shown the video that appeared to show him mimicking or reenacting the shooting, Hubbard said he was dancing.

V.    Verdict and sentence

A jury found Hubbard guilty of first degree murder (§ 187, subd. (a)) with true findings on gang (§ 186.22, subd. (b)(1)(C)) and personal gun use (§ 12022.53, subds. (b), (c) & (d)) allegations.

On January 18, 2022, the trial court found that Hubbard had a prior strike within the meaning of the Three Strikes law and sentenced him to 25 years to life, doubled to 50 years to life based on the strike, plus 25 years to life for the gun enhancement (§ 12022.53, subd. (d)). Based on Assembly Bill 333, the trial court did not sentence Hubbard on the gang enhancement.

# DISCUSSION

## I. Admission of gang evidence

Hubbard contends that admitting gang evidence violated his due process right to a fundamentally fair trial under recently enacted section 1109, which applied retroactively to him. After discussing Assembly Bill 333, which added section 1109, we reject Hubbard's contention, finding any error in admitting gang evidence harmless.

### A. *Assembly Bill 333*

Assembly Bill 333, which became effective on January 1, 2022 (see Stats. 2021, ch. 699), changed the law on gang enhancements. "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).)

Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).) [¶] Finally, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense." (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)

Courts of Appeal are divided on whether section 1109 applies retroactively, and the issue is pending review in the California Supreme Court. (See e.g., *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–567, rev. granted July 13, 2022, S274743 [§ 1109 applies retroactively]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1131 [same]; contra, *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, rev. granted Aug. 17, 2022, S275341 [§ 1109 does not apply retroactively]; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, rev. granted Aug. 17, 2022, S275090 [same].) The California Supreme Court declined to decide the retroactivity issue in *Tran*, *supra*, 13 Cal.5th at page 1208. Instead, the court found that any error in not bifurcating a gang allegation under section 1109 is subject to harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818. (*Tran*, at p. 1209.) The court also recognized that evidentiary errors result in a due process violation only where they render the trial fundamentally unfair. (*Ibid.*)

As did the court in *Tran*, we decline to address whether section 1109 is retroactive. Instead, we find that any error in not

9

bifurcating the gang enhancement for trial was harmless and did not render Hubbard's trial fundamentally unfair.

B. *Any error in admitting gang evidence was harmless*

Assembly Bill 333 does not limit the introduction of gang evidence where it is relevant to the underlying charges. (*People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Thus, "[e]vidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to the guilt of the charged crime." (*Hernandez*, at p. 1049.)

Here, gang evidence was relevant to motive, intent, and credibility. (See generally *People v. Chhoun* (2021) 11 Cal.5th 1, 32 ["motive can illuminate intent"].) Gang evidence explained why Hubbard would kill Zuniga, an apparent stranger. The evidence showed that Hubbard is a Fudge Town Mafia gang member: photographs showed Hubbard wearing Fudge Town Mafia gang attire and making gang signs with his hands, video showed him using gang vernacular, and he associated with Fudge Town Mafia gang members. The evidence further showed that Grape Street is one of Fudge Town Mafia's rivals, and Zuniga was shot in Watts Varrio Grape Street territory. The gang evidence thus tended to show that Hubbard, a Fudge Town Mafia member, deliberately went into rival gang territory to kill someone.

Evidence that Gonzalez and Dodson were Fudge Town Mafia gang members was also relevant to establishing a motive for the murder and identity. Two cars were involved in the

10

shooting: the Honda that Hubbard was in and the Infiniti registered to Gonzalez. Because the Infiniti was registered to Gonzalez, it is reasonable to infer he was in that car or allowed it to be used for the shooting. That a car connected to Gonzalez was used in the crime, coupled with evidence that Gonzalez and Hubbard were both Fudge Town Mafia gang members, buttressed the prosecution theory that there was a gang-related motive for the crime. As the gang expert testified, gang members often commit crimes together. That two cars, and at least three people (two men in the Honda and at least one person in the Infiniti) were involved in the shooting suggested the murder was a group—*a gang* effort.

Similarly, after Zuniga was shot, Hubbard called his friend Dodson, also a Fudge Town Mafia gang member. As a fellow gang member, Dodson could be relied on to hide the gun. Further, Dodson was a fellow gang member and, as such, forbidden from snitching on Hubbard, which explained why, at trial, he retreated from prior statements identifying Hubbard as the man who gave him the murder weapon. (See, e.g., *People v. Valdez* (2012) 55 Cal.4th 82, 137 [evidence a witness is afraid to testify admissible]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1169 [gang evidence admissible to explain difference in witness's pretrial and trial testimony].)

Thus, while we acknowledge the prejudicial nature of gang evidence generally, we cannot agree that it was so here, where the evidence was relevant to the underlying charge of murder.

And even if some gang evidence—for example, the predicate crimes and evidence of the pattern of crimes Fudge Town Mafia engaged in—should not have been admitted at the guilt phase of Hubbard's trial under section 1109, the nongang

11

evidence of Hubbard's guilt was overwhelming and compelling. (See, e.g., *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [where evidence of guilt on underlying charge is overwhelming, unlikely that trial format harmed defendant].)  Hubbard *admitted* he was in the car from which the fatal shots were fired.  Although he denied being the shooter, the evidence showed otherwise.  Video showed Hubbard, wearing red shorts and a *white shirt*, get into the Honda's *front passenger seat*.  Not long after leaving Nickerson Gardens, video showed the Honda stopped alongside Zuniga and an arm extending out of the Honda's *front passenger window*, pointing a silver gun at Zuniga.  The shooter wears what appears to be a *white shirt*.  (Peo. Ex. 42.)

Officer Castaneda followed the Honda after the shooting for several blocks, losing sight of it at 112th and Compton Streets. During that time, the officer did not see anyone exit the Honda. At Dodson's, only two men exited the car, with Hubbard exiting the front passenger seat still wearing a white shirt and walking awkwardly, the reasonable inference being to conceal the gun, which he gave to Dodson.  This evidence suggested that only two people were ever in the Honda, contrary to Hubbard's story that a third man was in the car but exited before they arrived at Dodson's residence.  Hubbard also can be seen in video footage after the shooting and while hanging out at Nickerson Gardens moving in a way that could be reasonably interpreted as reenacting the murder, that is, pretending to shoot a gun and falling to the ground.  This nongang evidence accordingly severely undercut Hubbard's story that the shooter was in the backseat behind the driver, and yet was able to shove Hubbard aside, shoot Zuniga out of the front passenger window, and exit the car unseen by Deputy Castaneda and surveillance cameras.

12

We therefore conclude that it is not reasonably probable Hubbard would have obtained a more favorable result in the absence of any gang evidence. (See generally *Tran*, *supra*, 13 Cal.5th at pp. 1209–1210.)

For similar reasons, admitting gang evidence did not render Hubbard's trial fundamentally unfair. As we have said, the prosecution relied primarily on video evidence to establish Hubbard's guilt on the underlying charge of murder. That evidence was compelling, especially given Hubbard's admission he was in the front passenger seat and video showing the gun pointing out of the front passenger window. In contrast, gang evidence was used to establish a motive for the murder and the identity of the participants, including Dodson. Because gang evidence was relevant to the underlying murder charge but was not the primary evidence of guilt, its admission did not render Hubbard's trial fundamentally unfair. (See, e.g., *Tran*, *supra*, 13 Cal.5th at pp. 1208–1209; see generally *People v. Partida* (2005) 37 Cal.4th 428, 439.)

II.     The section 12022.53, subdivision (d), enhancement

Hubbard was charged with and the jury found true personal gun use allegations under section 12022.53, subdivisions (b), (c), and (d). The trial court sentenced Hubbard to 25 years to life under subdivision (d) of that section. Hubbard now contends that the trial court misunderstood that it could either strike the section 12022.53 enhancement *or* sentence him to a lesser term under subdivisions (b) and (c). We disagree that the trial court misunderstood the scope of its sentencing discretion.

A defendant is entitled to a trial court's exercise of informed discretion at sentencing. (*People v. Tirado* (2022) 12 Cal.5th 688, 694 (*Tirado*).) If a court acts unaware of the

13

scope of its discretion, the court will have abused its discretion. (*Ibid.*)  Absent evidence to the contrary, however, we presume the trial court knew and applied governing law.  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

When sentencing a defendant before 2018, trial courts had to impose a section 12022.53 enhancement.  (*Tirado*, *supra*, 12 Cal.5th at p. 695.)  The Legislature then enacted Senate Bill No. 620 to give trial courts discretion to strike the enhancement in the interest of justice.  (*Tirado*, at pp. 695–696; § 12022.53, subd. (h).)  In *Tirado*, at page 692, the court held that under the new law, trial courts have discretion either to strike the enhancement or to impose an uncharged lesser enhancement under subdivisions (b) or (c) of section 12022.53.

Here, Hubbard argues that the trial court was unaware it could impose a 10-or-20-year term under subdivisions (b) or (c) because *Tirado* was issued on January 20, 2022, two days after Hubbard was sentenced on January 18.  *Tirado*, however, resolved a split in the Courts of Appeal about whether a trial court could strike a greater enhancement and sentence a defendant on an *uncharged* lesser enhancement not found true by a jury.  Here, the lesser enhancements were *charged*, found true by the jury, and were stayed by the trial court in favor of imposing the most severe enhancement.  Even before *Tirado*, courts had discretion under section 1385 to strike the greater enhancement and impose the charged, lesser one.  (See *People v. Morrison* (2019) 34 Cal.App.5th 217, 222 [where jury returned true findings on lesser enhancements under § 12022.53, subds. (b) & (c), striking subd. (d) enhancement would "leave intact the remaining findings"]; accord, *People v. Wang* (2020)

14

46 Cal.App.5th 1055, 1091.) Thus, when Hubbard was sentenced, there was no uncertainty in the law that *Tirado* resolved.

Hubbard nonetheless argues that statements the trial court made at sentencing show it thought it had the binary choice of striking the section 12022.53, subdivision (d), enhancement or imposing it. The trial court said it had read the People's sentencing memorandum and repeated that it understood that "with changes in the law," it had discretion to strike certain allegations.[4] Then, after the trial court sentenced Hubbard to 75 years to life, which included a sentence under section 12022.53, subdivision (d), the trial court clarified that it understood it had the discretion to strike that allegation and was not required to impose 25 years to life. Continuing, the trial court explained it was imposing 25 years to life under that section because the evidence established that Hubbard shot multiple times at an unarmed Zuniga, who was "minding his own business" and was not a threat.

The trial court's failure to expressly note it also had the discretion to sentence Hubbard to a lesser enhancement does not evidence its ignorance of that discretion. The trial court said it had read the People's sentencing memorandum, which requested that Hubbard be sentenced to a 10-years-to-life term under subdivision (b) of section 12022.53. The trial court therefore was

---

[4]     The trial court had similarly noted at a pretrial conference, that Hubbard was facing a "mandatory minimum" of 75 years to life in prison in part based on the section 12022.53, subdivision (d), enhancement. When the deputy district attorney pointed out that the trial court would have discretion to strike the enhancement, the trial court agreed and clarified it was stating Hubbard's maximum, not minimum, exposure assuming it did not strike the enhancement if found true.

15

informed of that option and rejected it.  Instead, the trial court made the informed, discretionary choice to impose the most severe firearm enhancement and to stay all the lesser firearm enhancements, explaining in detail why it was doing so.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.

16